IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-30083

_____

UNITED STATES OF AMERICA,                    Plaintiff-Appellee,

versus

THOMAS S. WALDRON,                          Defendant-Appellant.

_____

Appeal from the United States District Court for the
Middle District of Louisiana
_____

(March 18, 1995)

Before REAVLEY, DUHÉ and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Thomas S. Waldron ("Waldron") appeals his conviction and sentence on six counts of making a false statement on loan documents to a bank in violation of 18 U.S.C. § 1014.  We affirm.

FACTS AND PROCEDURAL HISTORY

In 1981, Waldron, a real estate developer in Florida, purchased property near West Palm Beach for $1,850,000.00 through his corporation Marpalm Ranch and Farm, Inc. ("Marpalm").  When Waldron began experiencing financial problems, he asked two business associates, Larry Reger ("Reger") and Harry Williams ("Williams"), if they wanted to buy into the venture and assume the mortgage payments on the property.

On March 9, 1982, Waldron signed a Contract for Sale and Purchase, which was an agreement between Richard Harris ("Harris"),

Reger and Williams's attorney acting as trustee, and Marpalm to sell the property. The contract contained an arrangement for a closing in escrow. On that same day, Waldron also executed a warranty deed to the trustee and a warranty deed with the grantee left blank. The contract gave the purchaser sole discretion to decide which of the two warranty deeds would be recorded. The contract also disclosed four pending disputes over environmental issues affecting the property.[1]

At closing, Waldron's documents were delivered to Harris's law firm, as escrow agent, to remain in escrow until April 1, 1992. Waldron received nearly $132,000.00 to compensate Marpalm for interest it had paid on the note. Sometime after the closing in 1982, Harris prepared an unsigned Land Trust Agreement, which was referred to in the warranty deed to the trustee.

In 1985, Waldron was introduced to Wendell Shelton ("Shelton"), the Chairman of the Board of Sun Belt Federal Bank ("Sun Belt"), a federally insured savings bank. Originally, Shelton proposed a $3,000,000.00 loan to Waldron based upon a mortgage of the Marpalm property. Shelton falsified Board minutes to obtain a commitment letter without the approval of the Board of Directors.[2] However, the loan negotiations broke down at closing

---

[1] Those issues were as follows: (1) a claim asserted by South Florida Water Management District; (2) a claim from the Florida Department of Environmental Regulation; (3) a claim from the United States Department of the Army; and (4) matters set forth in a final order issued by the Assistant Secretary of the State of Florida Department of Environmental Regulation.

[2] In a separate proceeding, Shelton pleaded guilty to charges arising out of that conduct. Waldron was charged as an

2

because the structure of the loan violated usury laws. Shelton and Waldron then agreed that Sun Belt would make three separate $1,000,000.00 loans to three corporations created by Waldron. Waldron installed three nominees in the three newly formed corporations to sign the applicable Sun Belt loan documents. Neither the nominees nor Sun Belt was told of the existence of the 1982 Contract for Sale and Purchase, the two warranty deeds, or the pending environmental proceedings.

On three successive Fridays in May 1985, each nominee signed a loan agreement and two affidavits.[3] When Harris found out about the Sun Belt loans involving the Marpalm property, he notified Clarence Rautenstrauch ("Rautenstrauch"), a representative employee of Reger. Rautenstrauch instructed Harris to record the deed.

On June 27, 1985, Harris sent a letter to Waldron informing Waldron of his clients' concern over the Sun Belt loans. Then on July 1, 1985, Harris notified Sun Belt by letter of his clients' intentions to record their 1982 warranty deed. On July 10, 1985, Harris filed the warranty deed to the trustee. Based upon Harris's

---

accomplice, but was acquitted.

[3]  Each loan agreement contained representations that:

> No litigation or governmental proceeding is pending or threatened against or affecting Borrower or the Land which may result in any material adverse change in Borrower's business, operations or the title to the Land or prevent or alter the use of the Land for any purposes;                        (and)
> The Land is not subject to any lien, security interest or other encumbrance except the first mortgage on Parcel A described in the mortgage title binder.

3

actions in filing the deed, Sun Belt stopped funding the loans.

Waldron was indicted by a grand jury on February 4, 1993. The indictment charged one count of bank fraud and aiding and abetting, one count of aiding and abetting false entry into bank records, and eight counts of false statements and aiding and abetting. At the conclusion of a jury trial in October 1993, Waldron was acquitted on bank fraud, false entry, and two counts of making false statements. He was convicted on the remaining six counts of making false statements. The district court denied a post-trial motion for judgment of acquittal and a new trial on February 2, 1994. On that same date, Waldron was sentenced to two consecutive 18-month terms of imprisonment on two counts, fined $2,000,000.00, and placed on five years probation following his release. His sentence was suspended on the remaining counts.

ANALYSIS

*Disclosure of a Valid Claim or Interest*

Waldron contends that his statements on the Sun Belt loan documents were true because under Florida law, neither Harris nor his clients had any valid claims or interests, recorded or unrecorded, in the Marpalm property. He argues that the language of the unsigned Land Trust Agreement left no doubt that the conveyance of the property was tied to execution of that agreement. Therefore, the 1982 Contract for Sale and Purchase and the two warranty deeds, in absence of the execution of the Land Trust Agreement, did not constitute a claim, encumbrance, or adverse

4

interest.[4]

We will reverse the district court's denial of a motion for judgment of acquittal only if no rational finder of fact could have found sufficient evidence, whether direct or circumstantial, to support a conviction, with all reasonable inferences drawn in the light most favorable to the verdict. *United States v. Faulkner*, 17 F.3d 745, 768 (5th Cir.), ___U.S.___, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994).[5]

Even assuming the 1982 Contract for Sale and Purchase and two warranty deeds were contingent upon the unexecuted Land Trust Agreement, we find that their existence was material to whether Sun Belt would risk extending the three $1,000,000.00 loans. The 1982 Contract for Sale and Purchase specifically states that conveyance of title shall be by "recordable Warranty Deed" and that "[p]ossession of the premises shall be delivered on April 1, 1982."

_____

[4] Waldron's argument that a literally true answer is not a criminally false statement relies heavily on *United States v. Chapman*, 7 F.3d 66 (5th Cir. 1993), *cert. denied*, ___U.S.___, 114 S.Ct. 2713, 129 L.Ed.2d 839 (1994). In *Chapman*, the defendant appealed a conviction of making false statements in connection with the acquisition of firearms. While he was appealing another criminal conviction, the defendant purchased a pistol, answering that he was not a "convicted felon" on the ATF forms. This Court reversed in part on the ground that under Texas law, the defendant was not a "convicted felon" during the pendency of his appeal. The Court concluded, therefore, that the defendant's statement was actually true. We find, however, that *Chapman* does not control in this case because the existence of the 1982 contract and two warranty deeds had an effect on the Sun Belt loans.

[5] To sustain a conviction under 18 U.S.C. § 1014, the Government must prove that defendant knowingly and willfully made a false statement to a financial institution for the purpose of influencing the financial institution's action. *See United States v. Bowman*, 783 F.2d 1192, 1197-98 (5th Cir. 1986).

It also states that at closing in escrow, "seller shall execute any and all...documents reasonably required to be executed in connection with the transfer of title to the property." The contract makes no mention of the Land Trust Agreement, which was never executed, but specifically gives the purchaser the discretion of filing either warranty deed. Once Harris became aware of the Sun Belt loans and notified his clients, he was instructed to and filed the warranty deed to the trustee. Therefore, the jury could reasonably find the contract and warranty deeds constituted a claim, encumbrance, or adverse interest in the Marpalm property that Waldron was required to reveal to Sun Belt.

*Disclosure of Environmental Proceedings*

Waldron contends that no reasonable jury could conclude that he knowingly made a false statement with regard to the ongoing environmental proceedings because the Government failed to present any evidence that Waldron knew that the loan statements prepared by his attorney, George Bailey, would omit the information.[6]

Our review of the record reveals that Waldron was present at the Sun Belt loan proceedings, giving him the opportunity to read the loan applications and discover the omitted information. In addition, in reviewing the loan documents, Waldron would have read the representation, which was in all three loan agreements, that "no litigation or governmental proceeding [was] pending." Therefore, we find a reasonable jury could have inferred that he

_____

[6] Waldron did disclose the environmental litigation to Harris and his clients in the 1982 Contract for Sale and Purchase.

6

had knowledge that the ongoing environmental proceedings were omitted from the loan documents and failed to disclose that omission to Sun Belt.

*Opinion Testimony and Exclusion of Documentary Evidence*

Waldron contends that the district court erroneously allowed Harris to testify as to his legal opinion on the ultimate fact in this case (whether, in light of the contract and deeds, Waldron's answers were false), and that the court did not cure the error by instruction because the judge failed to tell the jury to disregard Harris's testimony. Waldron also argues that the court abused its discretion when it admitted an unsigned, undated copy of the Land Trust Agreement that was central to his defense and then eliminated it the very next day.

Our review of the record reveals that Harris did not testify as to the ultimate issue of whether Waldron knowingly made false statements. Even if his testimony was erroneously admitted, the district judge cured the error by instructing the jury that Harris was not the judge of the law; the judge was. As for the court's admittance and subsequent exclusion of the unexecuted Land Trust Agreement, again, we find no abuse of discretion in light of the court's explanation and instruction given to the jury for his decision to exclude the evidence at a later time.

Our review of Waldron's remaining issues on appeal reveals no reversible error on the part of the district court. Therefore, we find that Waldron's remaining claims have no merit.

CONCLUSION

7

For the reasons articulated above, Waldron's conviction and sentence are AFFIRMED.