United States Court of Appeals
Fifth Circuit

**F I L E D**

September 5, 2003

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-41104

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

RICHARD JAMES TUCKER,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Texas

Before WIENER and BARKSDALE, Circuit Judges, and FURGESON, District Judge.[1]

FURGESON, District Judge:

Defendant-Appellant Richard James Tucker appeals from a jury verdict finding him guilty of one count of securities fraud and one count of mail fraud on the ground that the district court improperly excluded his securities expert. Tucker also appeals the district court's 1) failure to submit an element of the crimes charged to the jury, 2) misstatement of the intent element in the

---

[1] District Judge of the Western District of Texas, sitting by designation.

jury charge, 3)failure to provide a specific unanimity-of-theory instruction to the jury, and 4) imposition of consecutive sentences. For the reasons stated below we AFFIRM Tucker's conviction and sentence in full.

## FACTS AND PROCEEDINGS

First Fidelity Acceptance Corporation ("FFAC") was a Nevada corporation founded in 1991 and headquartered in Plano, Texas. Its purpose was to purchase and sell automobile loans in the form of installment sales contracts, secured by automobiles and light trucks. Upon acquiring the automobile loans, FFAC would then "package" the loans and sell them to financial institutions and large investors.

Tucker joined FFAC in April of 1992 as a consultant to aid the corporation in its first private placement of asset-backed securities. In September of that year, the FFAC Board of Directors named Tucker Chief Executive Officer and Chairman of the Board. According to Tucker, FFAC was performing exceptionally well from 1992 until the first quarter of 1996, with total assets worth $11,672,000. The Government, however, maintains that FFAC experienced mixed financial results from 1991 through 1995, at which time FFAC was facing a financial crisis.

In 1996, FFAC created a wholly-owned subsidiary, Automobile Receivables Corporation ("FFAC-ARC"), for the purpose of establishing certain investment trusts. Thereafter, FFAC-ARC organized three trusts with the goal of raising money to be

2

borrowed by FFAC and its subsidiaries for investment in automobile loans. In order to generate capital, the trusts facilitated the offer and sale of certificates; the minimum investment amount was $25,000.

To entice potential investors to purchase the trust certificates, Tucker drafted a Private Placement Memorandum ("PPM") describing the investment, the trust, and the trust's relationship to FFAC. The PPMs also contained a number of representations regarding how FFAC would handle and use the money collected from the investors. Notably, the PPMs promised that (1) the proceeds from the sale of the certificates would be used only for the purposes denoted in the PPM; (2) the trust at all times would have investments and cash with an aggregate value exceeding the balance of the certificates; (3) none of the assets in the trust would be available to FFAC or its subsidiaries without first paying to the trust the entire carrying value of such assets; and (4) investors could obtain refunds of their entire investments within ninety days of their requests. Each PPM's "specific use of proceeds" section indicated that the proceeds from the sale of the certificates would only be invested in automobile loans and automobile floor planning, or placed in insurance reserves or cash reserves.[2] Finally, the PPMs advised all potential investors that the investments were

_____

[2] In his appellate brief, Tucker also notes that "the PPMs permitted the monies received from investors to be transferred to FFAC and, in fact such a scenario was expected."

3

risky and subject to total loss, and that FFAC might be unable to sell the loans it acquired with the proceeds from the sale of certificates.

Tucker described the investments as securities in both the PPMs and in two Regulation D filings with the United States Securities and Exchange Commission ("SEC").[3] Tucker also represented to the SEC in the Regulation D filings that the money raised would not be used for "salaries and fees" or "repayment of indebtedness."

The Government presented as part of its case Tucker's conversations with various securities brokers in which Tucker assured them that the proceeds from the certificate sales would be used only for the purchase of automobile loans and not FFAC's business costs. Tucker allegedly made the same statements to a member of the FFAC Board of Directors.

The Government also offered evidence that Tucker prepared false financial records demonstrating that the funds raised by the sale of the certificates were invested as represented in the PPMs. Securities broker Joe Miller testified that his firm continually requested from Tucker financial statements reflecting the use of the trust funds. In response, Tucker, in July of 1997, sent financial statements to Miller indicating that he had purchased a large number of automobile loans with the proceeds, and that each

---

[3] *See* 17 C.F.R. §§ 230.501-.508.

of the *trusts*, not FFAC, possessed cash and automobile loans in excess of the amounts invested. Tucker made a similar representation to Miller's firm in March of 1998, weeks before the collapse of FFAC.[4]

The Government contended at trial that Tucker did not use the majority of the money raised from the sale of the certificates to purchase automobile loans. Instead, Tucker had used substantial amounts of the investors' funds to pay FFAC salaries, rent, legal fees, and other operating costs such as travel and entertainment expenses. Moreover, Tucker, it was maintained, had used the investors' funds raised in the third trust to repay investors in the second trust who had demanded reimbursement; had paid interest and principal on securities that FFAC had issued in 1995, as well as debts incurred prior to the creation of the trusts; and had paid a settlement in a civil lawsuit against him and FFAC with the proceeds of the certificate sales.

In April of 1998, the Chief Financial Officer of FFAC reported to FFAC's Board of Directors that the corporation was insolvent. Thereafter, the Board forced Tucker to resign. A team charged with reviewing the books and records of the trusts and FFAC concluded that FFAC was bankrupt and that the trusts held almost no assets of

---

[4] Although the Government alleges that Tucker created "bogus financial statements," Tucker asserts that his "records disclosed the expenditure of every dollar, whether raised from the investors or other sources, and [that] there was no second set of sham accounting records." We find it difficult to reconcile these two conflicting statements.

value. Those investors who had not withdrawn their investment by April 15, 1998, lost the principal of their investment in addition to any interest accrued. The losses incurred by all investors totaled over $15 million.

On November 14, 2001, a federal grand jury in the Eastern District of Texas returned a two-count indictment against Tucker, charging him with one count of securities fraud and one count of mail fraud.[5]

The first count accused Tucker of the "[u]se of interstate commerce for [the] purpose of fraud or deceit."[6] The indictment alleged that Tucker had engaged in all of the activities prohibited in 15 U.S.C. § 77q(a)(1), (2), and (3).[7] The Government averred in the indictment that Tucker's "scheme and artifice" to defraud was evinced in the various statements contained in the PPMs, as set

---

[5]   15 U.S.C. §§ 77q(a) & 77x (securities fraud); 18 U.S.C. § 1341 (mail fraud).

[6]   Section 77q, entitled "Fraudulent interstate transactions," makes it a crime:

> for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.  15 U.S.C. § 77q(a).

[7]   *See id*.

6

forth above.[8]

Specifically, count one of the indictment included charges that while making certain promises in the PPMs, Tucker neglected to disclose to potential investors, *inter alia*, that: (1) their investments would not be held in the trusts but rather deposited directly into FFAC's operating account; (2) the proceeds would be used to pay FFAC's operating costs; (3) previously invested funds had not been expended as promised; and (4) the "interest" paid to some investors consisted of the proceeds from certificate sales and not actual interest earned on investments in automobile loans. The Government averred that Tucker sent the fraudulent PPMs to potential investors via the United States mail, commercial interstate carriers, and interstate facsimile, and that he directed the investors to mail payments to FFAC's offices in Plano, Texas. Finally, the Government listed thirteen individuals whom Tucker had allegedly swindled, along with the dates of their investments, the

_____

[8]   According to the indictment, Tucker promised in the PPMs that:

> (1) the investors' money would be held in the trust, (2) the investors' money would be used to invest in automobile loans and not used to pay FFAC's operating costs, (3) the trusts would have investments and cash with an aggregate value or "liquidation value" in excess of the aggregate balance of the certificates at all times, (4) none of the assets of the trusts would be available to FFAC or its subsidiaries without first paying the trusts the full carrying value of such assets, (5) investors could receive their investments back in full in less than ninety days after requesting their funds, and(6) management of FFAC believed that there were no legal proceedings that were likely to have a material adverse effect on FFAC.

7

amounts, and their out-of-state addresses.

The second count of the indictment accused Tucker of mail fraud.[9] This count reiterated the allegations of count one, but added that Tucker, in effecting his scheme and artifice to defraud, knowingly and willfully caused investors to place into the United States mail envelopes addressed to FFAC and containing payment for the purchase of the trust certificates. The Government also duplicated the listing of investors in count one.

## DISCUSSION

## I. Exclusion of Expert Testimony

### A. Standard of Review

Tucker argues on appeal that the district court erred in

---

[9] The Mail Fraud statute provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. 18 U.S.C. § 1341.

preventing his securities expert from testifying.  We review the admission or denial of expert evidence for abuse of discretion.[10] "District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous."[11]  If it is found that the district court abused its discretion in denying the admission of expert evidence, we must then consider whether the error was harmless, "affirming the judgment unless the ruling affected a substantial right of the complaining party."[12]  In the criminal context, in assessing whether an error affected a "substantial right" of a defendant, the necessary inquiry is "whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence inserted."[13]

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[14] laid down the analytical framework for determining whether

---

[10]  *See Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 274 (5th Cir.1998) (en banc) (citing *General Elec. Co. v. Joiner,* 522 U.S. 136 (1997)).

[11]  *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir.1997) (internal quotations and citations omitted).

[12]  *United States v. Norris*, 217 F.3d 262, 268-69 (5th Cir.2000) (citations omitted).

[13]  *United States v. Roberts*, 887 F.2d 534, 536 (5th Cir.1989) (citing *United States v. Lay*, 644 F.2d 1087, 1091 (5th Cir. Unit A 1981) and *United States v. Lueben,* 812 F.2d 179, 187 n.7 (5th Cir.1987)).

[14]  509 U.S. 579 (1993).

expert testimony is admissible under Federal Rule of Evidence 702.[15]
"Under *Daubert,* Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'"[16] Accordingly, in order to be admissible, expert testimony must be both "relevant and reliable."[17]  The *Daubert* considerations apply to all species of expert testimony, whether based on "scientific, technical, or other specialized knowledge."[18]

## B.    Analysis

The district court concluded during trial that Rule 702 barred all of the testimony of Tucker's proposed expert, Joel Held.  The reliability of Held's testimony does not seem to be in dispute.

---

[15]  Rule 702 of the Federal Rules of Evidence provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  FED. R. EVID. 702.

[16]  *Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 243–44 (5th Cir.2002) (quoting *Daubert*, 509 U.S. at 592-93).

[17]  *Id*. at 244 (citing *Daubert*, 509 U.S. at 589).

[18]   FED. R. EVID. 702; *see also Pipitone*, 288 F.3d at 244 (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999)).

For instance, the district court declared that Held was "qualified to give opinions on customs and practices that are followed by competent practitioners in practicing security law and the preparation of Private Placement Memoranda and Offerings."  The brunt of the Government's argument was that Held's testimony would not have assisted the jury.  The appropriate inquiry here, therefore, is "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[19]

### 1.    Definition of "invest"

Held was prepared to elucidate the meaning of "invest in automobile loans" as that phrase was employed in the "specific use of proceeds" section of the PPMs.  Specifically, Held would have refuted the Government's contention that an *investment* in automobile loans meant only the *purchase* of the principal amount of the loans.  Held would have urged instead that an investment in automobile loans entails not only the purchase of  loans, but also the operating expenses and costs, such as payment of commissions, travel and entertainment, finder's fees, evaluation services, and attorney's fees.

This testimony is relevant to the issue of the definition of "invest," as the term was used in the PPMs.  Thus, the district court should have allowed Held to provide the jury with the usage

---

[19] *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985)).

of the word "invest" within the securities industry.

We find that the district court's failure to allow Held to testify as to an expanded definition of "invest," although improper, was not "manifestly erroneous."[20]  While Held's broader definition might have justified some of Tucker's expenses outside the purchase of automobile loans, the Government offered evidence that many of Tucker's expenditures violated even his liberal definition.  For instance, Tucker, in addition to using the proceeds for the operating costs of FFAC, also dispersed the funds in payment of principal and interest on loans unrelated to FFAC-ARC; settlement in a civil lawsuit; and interest and principal to investors in the previous trusts, perpetuating what is known as a Ponzi scheme.[21]

Tucker's proposed expert testimony would have been limited to an understanding of the term "invest in auto loans" that would include various *operating expenses* associated with the purchase of automobile loans.  Thus, even though the district court should have allowed Held to offer a definition that might have justified some of Tucker's expenses, Tucker still deceived the investors by spending the money in other unauthorized ways.  Because the expert

---

[20]  *Watkins v. Telsmith, Inc.*, 121 F.3d at 984 (internal quotations and citations omitted).

[21]  The Government also presented evidence that of the proceeds raised in the third trust, less than one percent was used to purchase automobile loans.  Held was not prepared to testify that the term "invest" included this kind of minimum purchase of automobile loans.

only addressed a fragment of the misuse of funds, and did not address substantial areas of Tucker's other applications of those funds, any error in excluding Held's testimony in this regard was minimal. Moreover, even if we were to conclude that the district court abused its discretion, Tucker cannot demonstrate how excluding the expert testimony affected a substantial right, that is, that Held's testimony regarding the meaning of the word "invest" would have planted a seed of doubt in the jurors' minds sufficient to acquit him of fraud.

### 2. Nature of the certificates

Tucker argues on appeal that Held also sought to testify that the certificates issued to the investors were not securities as defined by the Securities Exchange Act of 1934.[22] Under the terms of the Act, a security does not include "currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months . . . ."[23] Held would have opined that since the certificates at issue here were due immediately, they had a maturity date of less than nine months and therefore did not qualify as securities. Further, based on his expertise in the field of securities, Held would have testified that "generally companies take the position that notes that . . . have nine months or less of maturity and are similar to

---

[22] 15 U.S.C. § 78a.

[23] 15 U.S.C. § 78c(a)(10).

13

commercial transactions, . . . are generally not secured, not treated as securities for the purpose of registration with the SEC." Finally, Held would have posited that the certificates were part of a secured transaction regulated by the Uniform Commercial Code and not the securities laws. The basis for this latter opinion was the filing of a UCC-1 financing statement on behalf of the three trusts, conferring upon each one an equal security interest in all of the assets of FFAC.

Although Tucker raises this point of error on appeal, it is apparent from the record that he never intended to submit the information described above to the jury. Rather, Tucker agreed throughout the trial that Held's proffer with regard to the issue of whether the certificates were securities was helpful only to the district court's separate *legal* determination.[24] Thus, it was not error for the district court to exclude evidence that Tucker never intended to have the jury consider in the first place.

Moreover, even allowing that the district court somehow erred, Tucker has failed to show that Held's testimony with regard to the nature of the certificates would have affected the outcome of the trial. The fact that the certificates sold to the investors were redeemable on demand does not automatically remove them from

---

[24] At three points during the trial, Tucker asserted that whether the certificates were securities was a matter of law for the district court to decide.

classification as a security.  In *Reves v. Ernst & Young*,[25] The Supreme Court determined that a demand note could properly be considered a "security" regulated by the anti-fraud provisions. The *Reves* court rejected the notion that "legal formalisms"[26] were controlling and instead found that all suspect items should be adjudged by the "family resemblance" approach.[27]  The Supreme Court in *Reves* also found the "fundamental essence of a 'security' to be its character as an 'investment.'"[28] Under the circumstances, notwithstanding Held's opinion that certain qualities of the certificates favored the position that they were not securities, we agree with the district court's legal conclusion that the facts

---

[25]  494 U.S. 56 (1990).

[26]  *Id.* at 61 (noting that "Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called").

[27]  Pursuant to the "family resemblance" approach, a court must, after concluding that the disputed  transaction does not strongly resemble a member of the non-security "family,"
> [f]irst . . . examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it . . . Second, [the court must] examine the "plan of distribution" of the instrument . . . . to determine whether it is an instrument in which there is "common trading for speculation or investment" . . . . Third, [the court must] examine the reasonable expectations of the investing public . . . . Finally, [the court must] examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary. . . .

*Reves*, 494 U.S. at 66-67 (citations and internal quotations omitted)*; see also Trust Co. of Louisiana v. N.N.P. Inc.*, 104 F.3d 1478 , 1489 (5th Cir.1997).

[28]  *Reves*, 494 U.S. at 68-69.

overwhelmingly supported a finding that the certificates were indeed securities.[29]

Additionally, the record reveals that Tucker *was* able to elicit the testimony regarding the UCC-1 financial statement through Patti Plunkett, FFAC's former Chief Financial Officer. Plunkett testified about the existence of the UCC-1 filing and also explained that the trustee possessed a first lien position on all of the assets of FFAC for the benefit of the investors in the three trusts. Held's testimony in this regard, which would have merely highlighted these same characteristics, was cumulative and unnecessary.

In light of these matters, Tucker has not convinced us that the district court erred. Certainly, Tucker has not raised a plausible suspicion that the trier of fact would not have found him guilty beyond a reasonable doubt "with the additional evidence inserted."[30]

### 3. Tucker's belief as to the nature of the certificates

Much of Held's proposed testimony centered on his "understanding from the facts that Mr. Tucker believed, and relied upon, advice from counsel and others that the trust certificates

---

[29] The district court concluded that a weighing of the four family-resemblance factors "clearly indicate[d] that the certificates sold by FFAC were securities."

[30] *United States v. Roberts*, 887 F.2d at 536 (citations omitted).

16

involved were not securities, and therefore not regulated by the federal securities laws."[31] Tucker's argument, boiled down, is that he cannot be charged with a criminal violation of § 77q(a) if he did not subjectively believe that the certificates were securities.

We believe that Held's testimony in this regard was nothing more than an attempt by Tucker to testify by proxy, that is, to elicit the aid of a so-called expert to expound on Tucker's mental state and thereby avoid taking the witness stand and undergoing rigorous cross-examination.

Further, with regard to Tucker's belief concerning the nature of the certificates, the Ninth Circuit has explained that:

> the government is required to prove specific intent only as it relates to the action constituting the fraudulent, misleading or deceitful conduct, but not as to the knowledge that the instrument used is a security under the Securities Act. The government need only prove that the object sold or offered is, in fact, a security; it need not be proved that the defendant had specific knowledge that the object sold or offered was a security.[32]

Thus, by utilizing this view of specific intent, the Ninth Circuit reasoned that the Securities Exchange Act's *raison d'etre*, to prevent a seller's fraudulent behavior, was served rather than

---

[31]   Also in his written proffer, Held stated that he was prepared to testify that although he "did not provide Mr. Tucker with the original advice that the trust certificates were not securities, the law nonetheless supported the proposition."

[32]   *United States v. Brown*, 578 F.2d 1280, 1284 (9th Cir. 1978); *see also Buffo v. Graddick*, 742 F.2d 592, 597 (11th Cir. 1984); *Cook v. State*, 824 S.W.2d 634, 637 (Tex. App.– Dallas 1991).

undermined.[33]  The focus is then necessarily on whether a defendant possessed the intent to *defraud* investors, his belief as to the nature of the certificates notwithstanding.

By arguing that the certificates were not securities and therefore not subject to the anti-fraud provisions of the Securities Exchange Act of 1934, Tucker implicitly urges us to conclude that he was free to make whatever kind of representation he wanted to the potential investors, whether misleading or not. We flatly reject this reasoning and instead adopt the Ninth Circuit's view that the defendant's belief concerning the nature of the securities is irrelevant. Additionally, we find that Tucker's efforts to elicit factual testimony through his expert were impermissible.  Therefore, the district court properly excluded this portion of Held's testimony.

### 4.  Regulation D evidence

Finally, in what would have been Tucker's response to the Government's presentation of evidence that Tucker had submitted various filings with the SEC pursuant to Regulation D, Held sought to testify that based on his experience, the lead underwriters of the trusts, and not Tucker, were required to comply with the regulation.  To fall within the safe harbor provision of Regulation D, and therefore be immune from certain registration requirements with the Securities and Exchange Commission, there can be no more

---

[33]  *Brown*, 578 F.2d at 1284.

than thirty-five unaccredited investors in a given endeavor.[34] The regulation helps to ensure that mostly "sophisticated" purchasers are investing in private placements.

Tucker does not refute the Government's contention that he in fact filed Regulation D exemptions with the SEC. Rather, Tucker contends he was not responsible for complying with Regulation D regarding the permissible number of unaccredited investors. Thus, Tucker argues that Held's testimony was relevant as to the Regulation D information because Held "would have rebutted the prosecution's claim that Mr. Tucker violated Regulation D."[35] The district court excluded the evidence on Rule 702 grounds, concluding that Held was improperly attempting to evaluate the evidence and render his opinion as to what the brokers should have drawn from it.

At trial, the Government brought forth Joe Miller, who is the Chief Financial Officer of United Pacific Securities ("UPS"), one of the brokers offering the trust certificates. Miller testified that UPS could only monitor the number of unaccredited investors by cooperating with the issuer, since it only had the information of its own investors. Miller attested that if there were several brokers offering the same investment, it would be impossible to

---

[34] *See* 17 C.F.R. § 230.501–.508.

[35] Obviously, Held's beliefs were patently unreliable insofar as he would have opined that sellers in the securities industry commonly seek Regulation D protection for investments they do not consider to be securities. Thus, Held's speculative testimony regarding Tucker's intent was properly excluded.

19

monitor the number of unaccredited investors without the aid of the issuer, in this case, the trusts. The Government also offered a facsimile cover sheet from Tucker to Miller containing notations from a conversation between the two. Apparently, Miller had telephoned Tucker to inquire whether Tucker was monitoring the number of unaccredited investors. Miller wrote on the cover sheet: "Tucker says no problem with non-accredited. Has monitored closely."

The Government also presented the testimony of Plunkett, who testified that she tracked the number of accredited and unaccredited investors in each trust and prepared a spreadsheet containing that information, as well as the investors' names, the dates, and amounts of their investments. Plunkett testified that she later noticed Tucker's assistant concealing the accreditation information when faxing the spreadsheet to the broker dealers. Plunkett also claimed that Tucker subsequently instructed her to prepare two spreadsheets, one with the accreditation information and one without.

Finally, the Government offered the testimony of Adamont Georgeson, an attorney who performed legal work for FFAC, regarding the contents of a letter he prepared and sent to UPS. The letter informed UPS that, based on Georgeson's discussions with Tucker, the investment would be limited to accredited purchasers. Georgeson also testified that he had discussed the issue of the Regulation D restrictions with Tucker who "was very clear" that

20

there would be no unaccredited investors in the investments.

At the presentation of each of these witnesses, Tucker's trial counsel objected to the testimony on the grounds that Tucker was not being charged with a violation of Regulation D. In response, the Court agreed to provide a cautionary instruction advising that jury that it could

> not find the Defendant guilty of any crime charged in the indictment solely because he may have violated a regulation of the Securities and Exchange Commission. However, you may but are not required to consider evidence of violations of these regulations as you would any other evidence in determining whether the Defendant had the motive or required intent to commit the crimes charged in the indictment.

In response, Held proposed to testify that UPS, FFAC's principal broker, who had the list of investors, was primarily responsible for monitoring the number of non-accredited investors. According to Held, upon reaching thirty-five unaccredited investors, it was incumbent upon UPS, rather than Tucker, not to add more unaccredited investors so as to remain within the shelter of Regulation D.

We find that Held's testimony was not helpful to the trier of fact, and therefore was properly excluded by the district court. First, in the face of direct evidence that Tucker had doctored the spreadsheets which would have demonstrated whether a particular investor was accredited or unaccredited, and thereby aided the brokers in monitoring the investors' status, it is difficult to perceive how Held's "specialized knowledge" of the regulation would have assisted the jury in any way. Moreover, the record reveals

21

that UPS did in fact attempt to monitor its Regulation D obligations but was thwarted from doing so by Tucker's misrepresentations and omissions. Consequently, even accepting as true Held's assertion that it was the broker's responsibility, and not Tucker's, to ensure compliance with Regulation D, the facts as developed during the course of the trial show that, at any rate, Tucker sabotaged this obligation. Thus, the district court weighed the value of Held's testimony, not in a vacuum, but by focusing upon the particular facts and circumstances of the case, and determined that the testimony would not aid the jury.[36] We concur with that conclusion.

## II.  Faulty Jury Charge

Before the jury retired to deliberate, the district court instructed the jury on the laws that Tucker had been charged with violating. With regard to the securities fraud charge, the district court explained the elements of the crime.[37] Although the

---

[36]  *See* CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6264 at 210 (1997).

[37]  Specifically, the district court explained that the Government was required to prove beyond a reasonable doubt that:
(1) the defendant knowingly or willfully (a) employed a device, scheme, or artifice to defraud, or; (b) obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement not misleading, in the light of the circumstances under which they were made, or; (c) engaged in a transaction, practice, or course of business that operated or would operate as a fraud or deceit upon the purchaser; (2) that the Defendant's acts or omission were in connection with the purchase or sale of securities; (3) that the Defendant used, or caused to be used, the United States mail or

22

jury charge did not contain the phrase "intent to defraud," immediately following the delineation of the elements, the district court explained that Tucker acted with the requisite "intent to defraud" if he "acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or [to] bring about some financial gain" to himself. The district court also provided the jury with a definition of the term "security" mirroring the definition contained in the Securities Exchange Act of 1934.[38]

Then, turning to the mail fraud charge, the district court spelled out the essential elements of that crime for the jury.[39]

---

other means of transportation or communication in intestate commerce in furtherance of the scheme.

[38] The district court described a security as:
any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, reorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. *See* 15 U.S.C. § 78c(a)(10).

[39] The district court explained that in order to find Tucker guilty of mail fraud, the Government was required to prove beyond a reasonable doubt:
(1) that the defendant knowingly created a scheme to defraud, that is made false statements or omission of

23

Following the recitation of these elements, the district court clarified that "'knowingly,' as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident."

Tucker raises a number of potential shortcomings related to the jury instructions. First, he complains that the district court precluded the jury from determining whether the certificates sold to the investors were *securities*, a required element of a charge of securities fraud in violation of § 77q(a). Next, Tucker alleges that the district court did not adequately explain the requisite criminal intent for a § 77q(a) violation. Finally, Tucker calls attention to the district court's failure to include in the jury charge an instruction on specific unanimity of theory.

## A. Standard of Review

Tucker did not raise these objections to the district court's instructions at trial. Pursuant to Federal Rule of Criminal Procedure 52(b), we "may correct forfeited errors only when the appellant shows (1) there is an error, (2) that is clear or

----

material facts in the offer and sale of securities; (2) that the defendant acted with the specific intent to defraud; (3) that the defendant mailed something, or caused another person to mail something, through the United States Postal Service, or through a private or commercial interstate carrier, for the purpose of carrying our the scheme; and (4) that the scheme to defraud employed false material representations.

24

obvious, and (3) that affects his substantial rights."[40]   Once the appellant establishes these factors, "the decision to correct the forfeited error is within the sound discretion of the court, and the court will not exercise that discretion unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[41]

**B.   Analysis**

**1.   Failure to submit "security" element to the jury**

Tucker contends on appeal that the district court committed plain error by removing the issue of whether the certificates were securities from the jury's consideration.   As noted above, the district court, at Tucker's urging, determined that whether the certificates were securities was purely a legal question.[42]   Post-trial, the district court issued a ruling finding that the certificates at issue were, as a matter of law, securities.

Tucker asserts that the district court did not instruct the jury that in order to convict him of either count charged in the indictment, it would have to find beyond a reasonable doubt that the certificates sold to the investors were in fact securities.

---

[40]   *United States v. Waldron*, 118 F.3d 369, 371 (5th Cir.1997) (citing *United States v. Blocker,* 104 F.3d 720, 735 (5th Cir.1997)); FED. R. CRIM. P. 52(b).

[41]   *Waldron*, 118 F.3d at 371 (citing *Blocker,* 104 F.3d at 735).

[42]   It is rather disingenuous for Tucker to argue now that the matter of whether the certificates were securities should have been submitted to the jury when throughout the trial he argued that it was a matter of law to be decided solely by the district court.

Yet a reading of the jury charge reveals that the district court *did* submit this element to the jury. The district court explained to the jury that the second element, which the Government was burdened with proving beyond a reasonable doubt, required a showing "that the Defendant's acts or omissions were in connection with the purchase or sale of *securities*." As already noted, the district court then provided the jury with the definition of a security. We disagree with Tucker that the district court's definition of "security" was "cursory" and "superfluous." Rather, the district court furnished the definition of "security" as contained in the Securities Exchange Act of 1934. Most importantly, the district court at no time informed the jury that it was not to consider whether this element of the crime had been satisfied.

In refutation of the Government's claim that the security issue was actually delivered to the jury for consideration, Tucker points to the district court's post-trial order finding that the certificates were indeed securities. But the district court's later determination does not change the fact that three months prior, the "security" element appeared in the jury charge, and the jury made a finding that the certificates were securities in arriving at its decision to convict on this charge. As such, the district did not act improperly since it did not preclude the jury from making that determination.

2. **Failure to submit proper charge on § 77q(a) intent element**

26

The Government indicted Tucker for violating § 77q(a), which prohibits the fraudulent offer or sale of securities in interstate commerce.[43] In criminal prosecutions, violations of § 77q(a) are charged simultaneously with § 77x which contains the applicable *mens rea*.[44] Accordingly, § 77x provides that only "willful" violations of § 77q(a) trigger criminal liability.[45]

Tucker complains that with regard to the § 77q(a) violation, the district court failed to instruct the jury that in order to convict, it needed to find that he acted with the specific intent to defraud. According to Tucker, the root of the problem is the district court's direction that the jury could convict upon finding that Tucker acted knowingly *or* willfully. To be sure, the federal pattern jury charge for this crime employs the phrase "knowingly *and* deliberately."[46] Further, Tucker argues that since the district court *did* include the phrase "intent to defraud" in the elements of

---

[43] 15 U.S.C. § 77q(a).

[44] *Id.* §§ 77q(a) & 77x.

[45] Section 77x provides that:
Any person who willfully violates any of the provisions of this subchapter, or the rules and regulations promulgated by the Commission under authority thereof, or any person who willfully, in a registration statement filed under this subchapter, makes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $10,000 or imprisoned not more than five years, or both. 15 U.S.C. § 77x.

[46] 2B FED. JURY PRAC. & INSTR. § 62.03 (5th ed.).

27

mail fraud, there exists a real possibility that the jury believed the definition provided for that phrase related only to the mail fraud count. Thus, Tucker believes that the jury might have convicted him on a finding of lesser intent than that which is required by § 77x. Finally, Tucker faults the district court for failing to define the term "willfully" in the charge. All of these arguments fail.

With regard to district court's substitution of "or" for "and" in the phrase "knowingly or willfully" in the jury instructions, we find that this typographical mistake constitutes an obvious error. However, the district court's placement of the definition of "intent to defraud" immediately following the elements of the first count effaced any confusion the jury might have encountered concerning the requisite *mens rea*. In addition, even assuming that the jury convicted Tucker on the "lesser" criminal intent of "knowingly," the definition of that term provided to the jury in the mail fraud count – voluntarily and intentionally – was sufficiently like "willfully" to remove any doubt regarding the applicable mental state.

Tucker's second complaint that the district court failed to add "intent to defraud" into the elements of a § 77q(a) violation is equally unavailing. The district court's instructions mimicked the federal pattern jury charge, which makes no mention of "intent to defraud."[47] Thus, the failure to include that phrase within the

_____

[47] 2B FED. JURY PRAC. & INSTR. § 62.03.

28

essential elements of a § 77q(a) violation cannot constitute reversible error.

Finally, Tucker does not point to any case requiring the trial court to define within the jury charge "willfully," as that term is referred to in § 77x.

The Government points out that the evidence presented in the case clearly bespoke of willful, fraudulent behavior on the part of Tucker. The Government produced evidence that Tucker purposefully deceived the brokers, investors, regulators, and FFAC's Board of Directors. The Government also offered proof that Tucker concealed financial information, falsified financial summaries, drafted the PPMs, and controlled and directed the transfer of all of the investors' money. Tucker did not rebut this evidence with his own fact witnesses.

All of these factors, taken together, indicate that although the instructions concerning the requisite intent in the first count were not "faultless," they nonetheless provided the jury an adequate understanding of the intent element.[48] Certainly, the forfeited errors alleged by Tucker do not leave us "with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations."[49]

   3.   **Failure to charge jury on specific unanimity of**

---

[48] *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 425 (5th Cir.1985) (citations omitted).

[49] *Id.*

**theory**

Tucker asserts that the district court further erred by not including a specific unanimity-of-theory instruction in the jury charge. Each count of the indictment identified thirty mailings, each one creating a separate act of securities and mail fraud.[50] Thus, Tucker argues that in the absence of a specific unanimity instruction, the jurors might have convicted him despite internal disagreement about which mailing or mailings he initiated.

Tucker points to two Fifth Circuit decisions which he urges are controlling. In the first, *United States v. Gibson*, we considered a defendant's timely objection to "a court instruction that may have judicially sanctioned a non-unanimous verdict."[51] We found such an instruction to be reversible error. Presently, Tucker's reliance on *Gibson* is unfounded since he has not alleged that the district court affirmatively instructed the jury to disregard unanimity while deliberating.

In the second, *United States v. Holley*,[52] a jury convicted the defendant of two counts of perjury. Each count alleged that the defendant had made multiple statements, any one of which established criminal liability. Before submitting the instructions

---

[50] *Sanders v. United States*, 415 F.2d 621, 626 (5th Cir.1969) (reiterating that "[i]t is settled that each separate use of the mails in the execution of a scheme to defraud constitutes a separate offense")(citations omitted)).

[51] 553 F.2d 453, 457 (5th Cir. 1977).

[52] 942 F.2d 916 (5th Cir.1991).

to the jury, the defendant in *Holley* "specifically objected to the charge because it contained no . . . requirement . . . that all of the jurors concur in the knowing falsity of at least one particular statement."[53]    Finding the indictment to be duplicitous, we concluded that there was a "reasonable possibility that the jury was not unanimous with respect to at least one statement in each count" and ordered a new trial.[54]    Significantly, in *Holley*, the defendant lodged explicit objections to the charge; here, Tucker complains after having forfeited any potential errors in his charge, with his only relief residing in his ability to convince us that one or more of the errors he cites were clear and affected his substantial rights.

The guiding principle here should be our pronouncement in *Gibson* that "absent competent evidence to the contrary, a court has no reason to assume that an inconsistent or compromise verdict is not unanimous, and therefore has no justification for inquiring into the logic behind the jury's verdict."[55]    Moreover, we affirmed in *Holley* that a specific unanimity-of-theory charge was required under those circumstances where "there exists a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different

---

[53]  *Id.* at 929.

[54]  *Id.*

[55]  *Gibson*, 553 F.2d at 457 (citations omitted).

acts."[56]

Other than his bare assertion that the error "was plain and substantially prejudiced [him]," Tucker does not corroborate his claim of prejudicial error with a modicum of evidence tending to show that the jury was confused or possessed any difficulty reaching a unanimous verdict.[57]  Thus, even if we were to conclude that the district court's failure to include an instruction on specific unanimity of theory established clear error so as to have affected his substantial rights, Tucker cannot convince us that our failure to correct the error will "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings."[58]

## III. Double Jeopardy

As a final point of error, Tucker maintains that the district court's imposition of consecutive sentences caused him to be punished twice for the same offense in violation of the Fifth Amendment protection against double jeopardy.  Multiplicitous indictments, or indictments that charge a single offense in several counts, raise this concern.[59]  "A defendant must challenge the multiplicity of an indictment before trial or forfeit the issue. .

---

[56]  *Holley* 942 F.2d at 926 (citations and internal quotations omitted).

[57]  The Government directs our attention to the fact that the jury took only thirty-six minutes to deliberate before finding Tucker guilty.

[58]  *United States v. Waldron*, 118 F.3d at 371 (citing *Blocker,* 104 F.3d at 735).

[59]  *United States v. Reedy*, 304 F.3d 358, 363 (5th Cir.2002).

. . He may, however, raise claims about the multiplicity of sentences for the first time on appeal."[60] We have consistently held that "[t]he test for determining whether the same act or transaction constitutes two offenses or only one is whether conviction under each statutory provision requires proof of an additional fact which the other does not."[61]

In *United States v. Bruce*, this Court considered the similarities between the crimes of mail fraud and securities fraud and concluded that "there is one element in 77q(a) which is not present in § 1341 – the offer or sale of a security."[62] Tucker argues that by contrast, the district court deleted this sole distinction by instructing the jury that, with regard to the count of mail fraud, it could convict Tucker upon a finding that he "knowingly created a scheme to defraud, that is made false statements or omissions of material facts in the *offer and sale of securities*." Tucker avers that the district court's inclusion in the mail-fraud charge of the one distinguishing element between the two crimes rendered them one and the same.

---

[60] *Id.* at 364 (citing *United States v. Soape,* 169 F.3d 257, 265-66 (5th Cir.1999) and *United States v. Cooper,* 966 F.2d 936, 940 (5th Cir.1992)). Although Tucker mainly contests the multiplicitous nature of the jury charge and subsequent sentencing, he also points out the similarities between the counts charged in the indictment. Tucker has clearly forfeited any consideration of the latter.

[61] *Reedy*, 304 F.3d at 363. (citations omitted).

[62] *United States v. Bruce*, 488 F.2d 1224, 1230 (5th Cir.1973).

We agree with the Government's supposition that the district court was merely copying the Fifth Circuit pattern jury instructions when it described the scheme or artifice to defraud. Indeed, the first essential element for the crime of mail fraud in the pattern jury charge is as follows: "*First*: That the defendant knowingly created a scheme to defraud, that is _____ [describe scheme from the indictment] . . . ."[63] Moreover, the pattern jury instructions provide:

> It is not necessary that the government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme, or that the mailed material was itself false or fraudulent, or that the alleged scheme actually succeeded in defrauding anyone, or that the use of the mail was intended as the specific or exclusive means of accomplishing the alleged fraud.[64]

Although the district court did not include this instruction in its jury charge, the comment nonetheless evinces the drafters' intent to clarify the scheme underlying the allegation of mail fraud, rather than an intent to add an additional element to the crime. As such, the description of the scheme need not be proved to establish Tucker's guilt for the crime of mail fraud, and the sentences imposed were not multiplicitous.

## CONCLUSION

The district court erred in not allowing Tucker's expert witness to endorse an expanded interpretation of the term "invest," and thereby refute the Government's more restrictive meaning. But

---

[63] PATTERN CRIM. JURY INSTR. Fifth Circuit. § 2.59.

[64] *Id.*

because Held's explanation would have accounted for only a small portion of the widespread misuse of the proceeds, the district court's error does not constitute grounds for reversal.

We reject Tucker's argument that the district court improperly excluded evidence pertaining to the nature of the certificates, having found that it was never Tucker's aim to submit this issue to the jury.

Similarly, we find that the district court properly excluded Held's testimony as to Tucker's belief about the nature of the certificates.

The district court did not abuse its discretion by excluding Held's expert opinion that it was incumbent upon the underwriters and not Tucker to comply with Regulation D since this information would not have assisted the jury.

Turning to the jury charge, we conclude that the district court *did* submit the issue of whether the certificates were securities to the jury and therefore did not err by withholding this element. Moreover, Tucker cannot demonstrate that either the district court's jury instruction with respect to the intent element of a § 77q(a) violation, or its failure to instruct the jury on specific unanimity of theory, amounted to clear error sufficient to reverse the conviction.

Finally, Tucker failed to substantiate his claim that the sentences imposed were multiplicitous in violation of the Fifth Amendment protection against double jeopardy.

35

AFFIRMED.