United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 23, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-10861

PRIMROSE OPERATING COMPANY; CADA OPERATING, INC.,

Plaintiffs-Appellees,

VERSUS

NATIONAL AMERICAN INSURANCE COMPANY,

Defendant-Appellant.

Appeal from the United States District Court
For the Northern District of Texas

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Primrose Operating Company ("Primrose") and CADA Operating, Inc. ("CADA") (collectively, "Plaintiffs"), filed suit in Texas state court against National American Insurance Company ("NAICO"), seeking damages for an alleged breach of NAICO's duty to defend Plaintiffs in a lawsuit filed against them in Texas state court. NAICO removed to federal court based on complete diversity between the parties. A jury found for Plaintiffs and awarded damages against NAICO. NAICO filed a motion for judgment as a matter of law, which the district court denied. Following the district

court's entry of judgment, NAICO filed a motion to alter or amend judgment and a renewed motion for judgment as a matter of law. The district court denied these motions as well. NAICO now appeals the orders entering judgment and denying NAICO's motions.

## BACKGROUND & PROCEDURAL HISTORY

The Senn family owns a ranch in West Texas. Primrose operated an oil and gas lease on the ranch from 1992 to 1999, and CADA succeeded Primrose in 1999 as the operator of that lease. In September 1999, the Senns sued Plaintiffs,[1] and several other oil companies, for polluting their ranch, asserting claims including, inter alia, negligence, gross negligence, trespass, and nuisance. Primrose was insured during the time it operated the Senns' lease by three insurance companies: (1) Chubb Insurance Group ("Chubb") from April 1, 1991 to April 1, 1997; (2) Mid-Continent Casualty Company ("Mid-Continent") from April 1, 1997 to April 1, 1999; and (3) NAICO from April 1, 1999 until the time CADA succeeded Primrose as the lease operator in December 1999. CADA was solely insured by NAICO from December 1999 until April 1, 2001.

Primrose reported the suit to all three insurers and requested a defense. Chubb and Mid-Continent agreed to defend Primrose under a reservation of rights and retained, and agreed to pay the bills of, Kathleen McCulloch of Shafer, Davis, Ashley, O'Leary & Stoker (the "Shafer" firm). NAICO, however, denied coverage and refused

---

[1] CADA was not initially sued, but was added to the suit later.

2

to provide a defense for Primrose.  NAICO also refused CADA's request for a defense.  CADA, in turn, retained Ackels & Ackels (the "Ackels" firm) for its defense in the Senn litigation.  In March 2001, Primrose retained Rick Strange of the law firm of Cotton Bledsoe Tighe & Dawson (the "Cotton Bledsoe" firm), in addition to the representation Primrose was then receiving from the Shafer firm.[2]

At the time the Senn litigation went to trial in October 2001, a number of the other defendant oil companies, although it is unclear if all, had been dismissed.  During the first week of trial, CADA settled with the Senns and was dismissed from the suit.  Although Primrose received a judgment substantially in its favor, the state court granted the Senns a partial new trial limited to surface contamination issues.  The case was retried against Primrose in October 2002.  The jury in the second state action found that Primrose had negligently damaged the Senns' ranch, awarding the Senns damages in the amount of $2,194,000.  Primrose has appealed this judgment.[3]

Plaintiffs filed the present lawsuit in Texas state court in March 2002, seeking damages for NAICO's alleged breach of its duty to defend Plaintiffs in their suit with the Senns.  Plaintiffs,

---

[2] The Cotton Bledsoe firm was retained to represent Primrose's uninsured interest in the Senn litigation.

[3] At the time this opinion was issued, Primrose's appeal of the underlying suit was still pending.  Meanwhile, Mid-Continent posted a supersedeas bond and Chubb had withdrawn its defense.

both citizens of Texas with their principal places of business in Texas, specifically asserted breach of contract claims under the insurance policies issued to them by NAICO, in addition to claims under the Texas Insurance Code, and the Texas Deceptive Trade Practices Act (the "DTPA"). NAICO, a foreign corporation with its principal place of business in Oklahoma, thereafter removed the case to federal court based on complete diversity. The case was presented to a jury, and after the close of all evidence, both Plaintiffs and NAICO moved for judgment as a matter of law. The district court denied Plaintiffs' motion in its entirety, while granting in part NAICO's motion as it related to Plaintiffs' failure to offer any evidence to support their DTPA claims and CADA's inability to present sufficient evidence supporting its claims under the Texas Insurance Code.

The jury awarded Plaintiffs damages for NAICO's breach of contract and for Primrose's claim under Article 21.55 of the Texas Insurance Code. NAICO filed a motion for judgment as a matter of law and an alternative motion for a new trial, both of which were denied by the district court. After the district court entered judgment for Plaintiffs, NAICO filed a motion to alter or amend the judgment, arguing that the district court miscalculated prejudgment interest and the statutory penalty under Article 21.55. NAICO also renewed its motion for judgment as a matter of law and for a new trial. The district court also denied these motions. NAICO timely filed the instant notice of appeal with respect to the district

4

court's orders entering judgment and denying NAICO's motions for judgment as a matter of law and to alter or amend the judgment.

## DISCUSSION

### I. NAICO's Duty to Defend

NAICO first contends that the district court erred by failing to grant its motion for judgment as a matter of law on the issue of whether NAICO had a duty to defend Plaintiffs. This court reviews a district court's denial of a motion for judgment as a matter of law de novo. Pineda v. United Parcel Serv., Inc., 360 F.3d 483, 486 (5th Cir. 2004). "A motion for judgment as a matter of law should be granted if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for a party.'" Id. (quoting FED. R. CIV. P. 50(a)). "[I]f reasonable persons could differ in their interpretations of the evidence, then the motion should be denied. A post-judgment motion for judgment as a matter of law should only be granted when the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." Id. (internal quotations and citations omitted).

Under Texas law, an insurer may have a duty to defend a lawsuit against its insured.[4] See State Farm Lloyds v Borum, 53 S.W.3d 877, 889 (Tex. App.—Dallas 2001, no pet.) (finding that the duty to defend is broader than the duty to indemnify). Texas

---

[4] Because this is a diversity case, Texas substantive law applies. Cleere Drilling Co. v. Dominion Exploration & Prod., Inc., 351 F.3d 642, 646 (5th Cir. 2003).

5

employs the "eight corners" or "complaint allegation" rule when determining whether an insurer has a duty to defend. Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp., 198 F.3d 548, 551 (5th Cir. 2000). The eight corners rule requires the finder of fact to compare only the allegations in the underlying suit—the suit against the insured—with the provisions of the insurance policy to determine if the allegations fit within the policy coverage. Id. The duty to defend analysis is not influenced by facts ascertained before the suit, developed in the process of litigation, or by the ultimate outcome of the suit. Id. Fact finders, however, may look to extrinsic evidence if the petition "does not contain sufficient facts to enable the court to determine if coverage exists." Western Heritage Ins. Co. v. River Entm't, 998 F.2d 311, 313 (5th Cir. 1993).

The eight corners rule is to be applied liberally in favor of the insured, with any doubts resolved in favor of the insured. Guaranty Nat'l Ins. Co. v. Azrock Indus., Inc., 211 F.3d 239, 243 (5th Cir. 2000). "If any allegation in the complaint is even potentially covered by the policy then the insurer has a duty to defend its insured." Enserch Corp. v. Shand Morahan & Co., Inc., 952 F.2d 1485, 1492 (5th Cir. 1992) (emphases added); Terra Int'l, Inc. v. Commonwealth Lloyd's Ins. Co., 829 S.W.2d 270, 271–72 (Tex. App.—Dallas 1992, writ denied) (observing that courts are to "liberally construe the allegations in the third-party complaint to

determine if they fall within the provisions of the insurance policies," and "[i]f there is any doubt about whether the allegations reflect a potential liability, such doubt must be resolved in favor of the Insured").

To determine if NAICO had a duty to defend, this court must first look to the allegations in the underlying suit filed by the Senns. As "an amended pleading completely supersedes prior pleadings, . . . the duty to defend rests on the most recent pleading." Guaranty Nat'l Ins. Co. v. Vic Mfg. Co., 143 F.3d 192, 194 (5th Cir. 1998). Therefore, the operative pleading for purposes of our analysis is the Senns' Fourth Amended Original Petition, in which the Senns alleged that Primrose and CADA, along with several other oil companies, polluted their ranch through releases of saltwater, oil, and other fluids. Specifically, the Senns contended that these releases contaminated the surface, subsurface, and groundwater of their ranch.

In an insurance coverage dispute analyzed under the eight corners rule, "[t]he insured bears the initial burden of showing that there is coverage, while the insurer bears the burden of proving the applicability of any exclusions in the policy. Once the insurer has proven that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion." Guaranty Nat'l, 143 F.3d at 193 (citation and footnote omitted). The insurance policies at issue here contain three relevant sections: (1) Exclusion (f) of the

7

general commercial liability ("CGL") policy, i.e., the "Pollution Exclusion" clause; (2) the "Contamination or Pollution Coverage," (the "Pollution Endorsement"); and (3) the "Saline Substance Contamination Coverage," (the "Saline Endorsement").[5] Plaintiffs argue and NAICO concedes that the CGL policy purchased from NAICO covers the Senns' allegations. NAICO contends, however, that an exclusion to the CGL policies, the Pollution Exclusion clause, by itself excludes coverage. In response, Plaintiffs argue that by purchasing two endorsements, the Pollution Endorsement and the Saline Endorsement, the claims represented by the Senns' allegations are brought back within the language of the CGL policy.

**A.    The Pollution Exclusion Clause**

The Pollution Exclusion does not afford coverage for:

f.    Pollution

(1)    "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a)    At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;
. . .

(d)    At or from any premises, site or location on which

_____

[5] The policies that NAICO issued to Primrose and CADA contain all three sections; therefore, the same coverage arguments apply to both Primrose and CADA.

8

> any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
>
> . . .
>
> > (2) Any loss, cost or expense arising out of any:
> >
> > > (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants[.]

NAICO contends that section f(1)(a) of the Pollution Exclusion applies to the Senns' claims because Plaintiffs "occupied" the land upon which pollutants were released. Plaintiffs do not dispute that the Pollution Exclusion, by itself, would bar coverage; however, according to Plaintiffs, the Pollution Endorsement specifically operates to eliminate the Pollution Exclusion clause, subject to six listed conditions. Plaintiffs argue, therefore, that the Pollution Exclusion precludes NAICO's duty to defend <u>only if</u> one of the six conditions is not met. We agree.

**B.   The Pollution Endorsement**

Only three of the six conditions necessary for the application of the Pollution Endorsement—and the effective elimination of the Pollution Exclusion—are contested. Specifically, NAICO argues that: (1) Condition b ("sudden & accidental"); (2) Condition d

9

("prior incidents"); and (3) Condition f ("violation of law"), are not satisfied on the basis of the Senns' allegations.

1.    <u>Condition b: Sudden, Accidental, and Unexpected</u>

Condition b requires that the pollution incident be "an accident and unintentional release, discharge, emission or escape of pollutants" and that such an incident be "sudden and accidental and is neither expected nor intended by any insured." NAICO contends that the pollution incidents of which the Senns complain were expected by Plaintiffs and were neither sudden nor accidental.

This court has held that under Texas law, the "[sudden and accidental] clause contains a temporal element in addition to the requirement of being unforeseen or unexpected." <u>Guaranty Nat'l</u>, 143 F.3d at 193–94. The "'sudden and accidental' requirement unambiguously exclude[s] coverage for all pollution that is not released quickly as well as unexpectedly and unintentionally." <u>Id.</u> at 194 (internal quotations and citations omitted).

Texas law defines "accidental" as an unforeseen and unexpected event. <u>Gulf Metals Indus., Inc. v. Chicago Ins. Co.</u>, 993 S.W.2d 800, 805 (Tex. App.—Austin 1999, pet. denied). The Senns do not allege that Plaintiffs expected the pollution incidents of which the Senns complain or that the incidents were accidental. The Senns, however, alleged that Plaintiffs were negligent, causing potentially permanent groundwater contamination, among other damage, "because [Plaintiffs] failed to exercise ordinary care in the conduct of its oil and gas operations." Not expecting a

10

particular incident to occur and an accidental occurrence are completely consistent with a claim of negligence. "[T]here is an accident when the action is intentionally taken, but is performed negligently, and the effect is not what would have been intended or expected had the action been performed non-negligently." Harken Exploration Co. v. Sphere Drake Ins. PLC, 261 F.3d 466, 472 (5th Cir. 2001) (emphases added); Hallman v. Allstate Ins. Co., 114 S.W.3d 656, 661 (Tex. App.—Dallas 2003, pet. filed).

This court has previously held that "[t]he operation of the oil facilities is the action deliberately taken, but alleged to have been performed negligently. The contaminated water . . . caused by the pollutants . . . [is] the unintended and unexpected effect[] of the non-negligent operation of an oil facility." Harken, 261 F.3d at 474.[6] Moreover, a "pollution incident" is

_____

[6] NAICO's attempt to distinguish Harken is unavailing. NAICO claims that the focus here, per Condition b, is whether a pollution incident was expected, while in Harken, the focus was on whether the effects—i.e., the damages—were expected. As the definition of a pollution incident requires that environmental damage result, the focus here is the same as in Harken. Our inquiry asks whether Plaintiffs expected a spill, release, etc., that would result in environmental damage.

Further, it is irrelevant to argue, as NAICO does here, that the spills of which the Senns complain were of a type that were expected by Plaintiffs. The Senns do not allege, and NAICO does not suggest, that Plaintiffs expected that its "day-to-day" operations would lead to environmental damage, as required by the definition of a pollution incident. Therefore, the mere expectation of day-to-day normal spills does not mean that Plaintiffs necessarily expected pollution incidents. See Harken, 261 F.3d at 474.

11

defined in the Pollution Endorsement as "[a]n occurrence consisting of any actual emission, discharge, release or escape of pollutant . . . [which] results in environmental damage." (Emphasis added). Therefore, at least one of the Senns' negligence allegations could have potentially resulted in an unexpected and accidental pollution incident, thereby resulting in coverage under NAICO's policies.

The temporal requirement of "sudden and accidental" requires that the pollutant be released quickly. Guaranty Nat'l, 143 F.3d at 194. Texas law defines "sudden" as an abrupt or brief event. Pioneer Chlor Alkali v. Royal Indem. Co., 879 S.W.2d 920, 937 (Tex. App.—Houston [14th Dist.] 1994, no writ). The Senns do not allege that any of the pollution incidents resulted in a quick or sudden release of damaging pollutants, and therefore, it is impossible to discern from the complaint alone if the "sudden" requirement is satisfied. As the complaint "does not contain sufficient facts to enable [the] court to determine if coverage exists, it is proper to look to extrinsic evidence" to determine whether the Senns' claims were potentially covered by the policy. Western Heritage, 998 F.2d at 313.

NAICO argues the Senns alleged that the spills repeatedly occurred in Plaintiffs' "day-to-day operations" and that Primrose's president testified that all the spills of which the Senns complain "are the typical type of . . . spills that you would expect to see in Primrose's normal operations." NAICO contends that because of Plaintiffs' multiple spills over three years, a duty to defend

12

cannot be created by "microanalyzing the case and finding a single spill that may have been sudden and accidental." Guaranty Nat'l, 143 F.3d at 194. The alleged polluting, concludes NAICO, was anything but sudden. We disagree.

NAICO's reliance on Guaranty National is misplaced. In Guaranty National, as here, the pleadings did not assert a "sudden and accidental" pollution, thus enabling the court to look outside the pleadings to determine if coverage existed. Id. at 194–95. The underlying plaintiff in Guaranty National listed in its answers to interrogatories that there were "seventy-seven spills at nineteen of the facilities occurring over a period of approximately forty years. Several of the listed spills actually [were] multiple spills, so that the . . . pollution [was] the result of over a hundred separate events." Id. at 195. The contamination was attributed to both small and large spills that occurred at dry cleaning facilities as a result of allegedly defective dry cleaning equipment manufactured by the insured. Id. The Guaranty National court first acknowledged that "[a] single covered claim will suffice to require the insurer to defend the entire case." Id. Nevertheless, it held that the insured could not "create a duty to defend by microanalyzing the case and finding a single spill that may have been 'sudden and accidental.'" Id. In reaching this conclusion, the court relied on a pollution exclusion in the policy that prevented coverage "where the insured has engaged in the

13

deliberate discharge of contaminants <u>in the routine course of business</u> over many years." <u>Id.</u> (emphasis added) (internal quotations omitted). Because of this exclusion, "the fact that the insured may have also experienced isolated spills or minor accidents over the same period is irrelevant." <u>Id.</u> (citation omitted). Such is not the case here where the policy at issue does not have a "routine business pollution" exclusion.

In addition, the Senns' Fourth Amended Petition does not allege that the spills at issue occurred only in Plaintiffs' day-to-day operations. Rather, the Senns allege that Plaintiffs, "[i]n their day-to-day operations, . . . have <u>failed to prevent</u> and/or have caused to occur certain spills." (Emphasis added). Plaintiffs here were not engaged in activities involving their deliberate discharge of contaminants in the routine course of business.[7] The "failure to prevent" spills leaves open the possibility, which the jury was certainly entitled to consider, that the alleged spills could been have sudden, <u>i.e.</u>, quickly

---

[7] In <u>Guaranty National</u>, the insured was a manufacturer of dry cleaning equipment that used perchloroethylene ("perc"). 143 F.3d at 193. The underlying plaintiffs alleged that the insured had knowledge of the environmental hazards associated with perc, but nevertheless instructed the companies who purchased the equipment to drain perc into the sewage system knowing that it would sink to the bottom and remain a potentially hazardous material. <u>Id.</u> at 194. Clearly, the allegations and factual background in <u>Guaranty National</u> can be distinguished from the Senns' Fourth Amended Petition and the facts as they exist here. We find unpersuasive NAICO's argument that Plaintiffs here were engaged in the "deliberate discharge of contaminants in the routine course of business." <u>Guaranty Nat'l</u>, 143 F.3d at 195.

14

released.

Moreover, there was testimony elicited at trial revealing that the oil companies' flow lines carry their contents under extreme pressure and that when the lines burst, the event occurs suddenly, sometimes resulting in a spray of water as high as forty feet in the air. There was also testimony establishing that the pressure in the tank batteries and flow lines were checked at least daily, therefore, Plaintiffs were made aware of any compromise in the production equipment almost immediately. While the breaks causing the leaks and spills were undoubtedly caused by conditions created over a number of years, the policy's "sudden" requirement is satisfied as long as the actual break is "sudden and accidental." See Pioneer, 879 S.W.2d at 937 (rejecting the argument that an incident was not "sudden and accidental" based on the extended period of time during which corrosion damage to three liquefier tubes developed). This evidence supports the jury's finding that at least one of the alleged spills could have potentially occurred suddenly. Liberal application of the eight corners rule in favor of Plaintiffs, in concert with the deference given to the jury verdict, support a finding that Condition b was satisfied.

2. Condition d: Incidents Prior to the Policy Period

Condition d provides that the injury or damage from a pollution incident must "not [be] caused or contributed to in any degree by any pollution incident that commenced prior to the beginning of the policy period." In their pleadings, the Senns

15

lumped Plaintiffs together and alleged a wide variety of negligent acts of the two, but did not distinguish which of the two plaintiffs had done what. The Senns further alleged that "such acts of negligence have produced an indivisible injury to [the Senns'] property."

NAICO argues that the allegation of an "indivisible injury" is "fatal" to Plaintiffs' claims. First, with respect to CADA, assuming the injury to be indivisible, NAICO argues that the damage caused by CADA was thus "indivisible" from that caused by Primrose. NAICO argues, therefore, that because the damages caused by Primrose obviously took place prior to NAICO's coverage of CADA, this necessarily means that the alleged damage was "caused or contributed to . . . by [a] pollution incident that commenced prior to the beginning of the policy period." The coverage for Primrose, according the NAICO, fails for the same reason. The Senns do not distinguish between damages caused by Primrose before NAICO's coverage began for Primrose and after the coverage began. Because the acts of negligence caused indivisible damage, NAICO contends, the damages occurring after NAICO's coverage of Primrose are also necessarily "caused or contributed to" by pollution incidents prior to the beginning policy.

We find NAICO's argument unpersuasive. NAICO fails to distinguish among the alleged negligent acts, the resulting

16

"pollution incidents,"[8] and the injury arising from the pollution incidents. The allegations state that the "acts of negligence have produced an indivisible <u>injury</u>," not that the negligent acts or the pollution incidents themselves are indivisible. (Emphasis added). The allegation of an indivisible injury does not compel the conclusion that a pollution incident caused by either Primrose or CADA during NAICO's coverage was necessarily caused, or contributed to, by a pollution incident attributed to a negligent act of Primrose prior to NAICO's coverage. From the allegations alone, it is fully possible that a pollution incident caused entirely by Primrose during NAICO's coverage resulted in an injury that is now completely indivisible from an injury resulting entirely from a pollution incident caused by CADA.[9]

Because the Senns do not specifically allege when the pollution incidents occurred, it is impossible to determine from the pleadings alone whether any pollution incident occurred during NAICO's coverage of Primrose.[10] This court, therefore, may look to

---

[8] A pollution incident is defined as "[a]n occurrence consisting of any actual emission, discharge, release or escape of pollutants . . . . The entirety of any such actual emission, discharge or escape shall be deemed to be one pollution incident."

[9] For instance, the Senns allege that Plaintiffs' negligence caused groundwater contamination. As Plaintiffs have occupied the same land, but at different times, groundwater damage is likely an indivisible injury—it may be difficult to identify what portion of the injury came from which Plaintiff. Yet, the pollution incidents causing the damage would be wholly independent of each other.

[10] As CADA was insured solely by NAICO, any claim against CADA necessarily falls within the period of NAICO's coverage.

17

extrinsic evidence to answer this question. <u>Western Heritage</u>, 998 F.2d at 313. As the parties have stipulated that some spills occurred after April 1, 1999, <u>i.e.</u>, when NAICO's coverage of Primrose began, and because NAICO does not contend there were no pollution incidents that occurred during its coverage of Primrose, the allegations represent claims that are potentially covered by NAICO's policy. <u>Enserch Corp.</u>, 952 F.2d at 1485 (concluding that "[i]f <u>any</u> allegation in the complaint is <u>even potentially</u> covered by the policy then the insurer has a duty to defend its insured") (emphasis added). Because Plaintiffs have established coverage during all relevant time periods, they have accordingly satisfied the requirements for Condition d.

### 3. <u>Condition f: Failure to Comply with Laws, etc.</u>

Condition f states that the pollution incident must "not result from or [must not be] contributed by [the insured's] failure to comply with any government statute, rule, regulation, or order." NAICO claims that because the Senns state in the introduction to their allegations that the laws of Texas mandate that any spill be cleaned up, and that because the failure to clean up the spills resulted in the continued migration of the pollutants, the alleged pollution incidents are necessarily "contributed to by [Plaintiffs'] failure to comply with" Texas laws.

NAICO's argument is meritless. The Senns' negligence allegations are completely independent of any allegation of

18

statutory or regulatory noncompliance—the Senns alleged that Plaintiffs committed several acts of negligence, none of which involved a duty based on any statute or regulation.[11]  Further, because "[c]ompliance with industry and statutory standards is evidence of the use of reasonable care, but it is not dispositive of that issue," the Senns may prevail on their negligence claims even if Plaintiffs are found not to have violated any law at all. See Morris v. JTM Materials, Inc., 78 S.W.3d 28, 50 (Tex. App.—Fort Worth 2002, pet. filed).

## C.    Saline Endorsement

NAICO argues that the Saline Endorsement, as part of the entire CGL policy, is subject to both the Pollution Exclusion and the Pollution Endorsement.  Plaintiffs contend that because they purchased the Saline Endorsement, NAICO's duty to defend is triggered when the Senns specifically alleged that Plaintiffs polluted their ranch through the releases of saltwater.  Because we have determined, as discussed supra, that all six conditions of the Pollution Endorsement have been satisfied, the Pollution Endorsement cannot have a limiting effect on the Saline Endorsement's creation of coverage for the Senns' allegations relating to saltwater contamination.  Nevertheless, we further

---

[11] The Senns' reference to the laws and statutes of Texas is found in the "Background Information" of their pleading, not in the section alleging and discussing negligence.  Further, the referred-to, unspecified laws and statutes apparently dealt with the requirement of cleaning up after a spill, and not with the avoidance of the spill in the first place.

19

conclude that the Saline Endorsement is not conditioned either on the Pollution Exclusion or the Pollution Endorsement.

Under Texas law, an insurance policy "must be considered as a whole, and each part given effect and meaning." Valmont Energy Steel, Inc. v. Commercial Union Ins. Co., 359 F.3d 770, 773 (5th Cir. 2004). Further, under Texas law "[a]n endorsement cannot be read apart from the main policy, and the added provisions will supersede the previous policy terms to the extent they are truly in conflict." U.E. Texas One-Barrington, Ltd. v. Gen. Star Indem. Co., 243 F. Supp. 2d 652, 661 (W.D. Tex. 2001).

The CGL base policy excludes coverage for injuries and damages caused by the release of pollutants. "Pollutants" are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." "Saline substances," however, are not included in the Pollution Exclusion's definition of "pollutants." The Pollution Endorsement defines pollutants in exactly the same terms as the Pollution Exclusion, except that the Pollution Endorsement explicitly adds "saline substances" as being a covered pollutant.

Interpreting the insurance policy as a whole, including the two endorsements, the intent of the parties was: (1) to have the CGL base policy bar coverage for a claim involving any "pollutant," as that term was defined in the Pollution Exclusion clause; (2) to

20

have the Pollution Endorsement offer coverage for pollution incidents, including those involving saline substances, subject to the six listed conditions; and (3) to have the Saline Endorsement increase the amount of Plaintiffs' coverage for damages caused by saline substances, while also expressly defining property damage covered under this endorsement as including property damage "caused directly or indirectly by a saline substance."

NAICO asserts that the Saline Endorsement was limited by the six conditions found in the Pollution Endorsement, and therefore argues that Plaintiffs must satisfy those conditions before enjoying the benefits of the Saline Endorsement. We first note the language of the Saline Endorsement, which provides that "[t]his endorsement modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE FORM." There is no mention anywhere in the policy that the Saline Endorsement is modified or conditioned on the Pollution Endorsement. Also, it follows that because Plaintiffs paid two separate premiums for two separate coverages, one endorsement cannot be read to be dependent on the other. Either endorsement could have been purchased separately, as there was no requirement that an insured was compelled to purchase both together. Moreover, if there were any confusion as to the applicability of these endorsements to Plaintiffs' request for a defense in the underlying Senns litigation, it is important to note that NAICO wrote Plaintiffs' policies. If it had wanted to, NAICO could have drafted the endorsements in a manner so as to make the

21

Saline Endorsement subject to the conditions found in the Pollution Endorsement. By not doing so, NAICO cannot now read such a condition precedent into the policies.

NAICO also suggests that the Saline Endorsement operated only to increase the amount of coverage to $2 million, not provide for additional covered events, i.e., property damage resulting from saltwater contamination. If we were to accept NAICO's argument here, the $2 million coverage limit would render the entire Saline Endorsement meaningless because essentially everything covered by the endorsement would necessarily be excluded by the Pollution Exclusion clause. We see no reason why Plaintiffs would elect to purchase an endorsement that increased the amount payable to them on a coverage claim, but failed to provide a basis upon which they could make such a claim.

## II. Damages Sustained by Primrose for Hiring Extra Counsel

Having determined that NAICO had a duty to defend Plaintiffs, we next address the propriety of the damages awarded Primrose for its hiring of the Cotton Bledsoe firm. The jury awarded Primrose $183,741 in damages -- the amount of the attorney's fees charged by the Cotton Bledsoe firm. NAICO contends that Primrose did not sustain any damages because Primrose received a paid-for defense from its other insurers through the Shafer firm. NAICO argues that it was unnecessary for Primrose to hire the Cotton Bledsoe firm to ensure an adequate defense against the Senns' claims.

22

"On the issue of whether damages should be awarded at all, this Court treads lightly upon jury verdicts, as the standard of review is very deferential." Vogler v. Blackmore, 352 F.3d 150, 154 (5th Cir. 2003). Absent an error of law, this court will sustain the amount of damages awarded by the fact finder, unless the amount is "clearly erroneous or so gross or inadequate as to be contrary to right reason." Id. Thus, reversal is proper only if no reasonable jury could have arrived at the verdict. Id.

The potential error of law focuses on whether the award of damages for Primrose's retention of the Cotton Bledsoe firm exceeded the scope of NAICO's duty to defend. When an insurer has a duty to defend, even where "a claim falls partially within and partially outside of a coverage period, the insurer's duty is to provide its insured with a complete defense." Tex. Prop. and Cas. Ins. Guar. Ass'n/Southwest Aggregates v. Southwest Aggregates, Inc., 982 S.W.2d 600, 606 (Tex. App.—Austin 1998, no pet.) (emphasis added). A breach of the duty to defend entitles the insured to the expenses it incurred in defending the suit, including reasonable attorney's fees and court costs. Willcox v. Am. Home Assurance Co., 900 F. Supp. 850, 856 (S.D. Tex. 1995) (emphasis added); see also Tex. United Ins. Co. v. Burt Ford Enters., Inc., 703 S.W.2d 828, 835 (Tex. App.—Tyler 1986, no writ). To find an error of law with respect to the scope of the duty to defend, this court is faced with determining whether the duty to provide a "complete defense" is necessarily satisfied when other

23

insurers provide one law firm to defend the insured or whether the cost of hiring an additional firm is unreasonable as a matter of law. NAICO does not provide this court with any authority to suggest that either is the case.[12] Whether any one firm in a

---

[12] NAICO cites two cases which fail to support its contention that, as a matter of law, an insured is not entitled to recover costs for additional counsel. NAICO first cites <u>Champion v. Farm Bureau Insurance Co.</u>, 352 So. 2d 737 (La. Ct. App. 1977), <u>disavowed on other grounds by Dugas Pest Control of Baton Rouge, Inc. v. Mutual Fire, Marine & Inland Insurance Co.</u>, 504 So. 2d 1051, 1054 (La. Ct. App. 1987), for the proposition that an insured is "not entitled to recover the costs which he may incur by engaging separate counsel." <u>Champion</u>, 352 So. 2d at 742. NAICO, however, reads too much into the language of <u>Champion</u>, which found that:

> All that is required of the insurer to satisfy its obligation to defend is to provide the insured with an <u>adequate defense</u> on the merits. The insured may retain his own counsel if he so chooses. The mere fact that he engages separate counsel to represent him, however, does not of itself prove that the insurer failed to fulfill its contractual duty. <u>If the insurer provides the insured with an adequate defense</u>, then the latter is not entitled to recover the costs which he may incur by engaging separate counsel.

<u>Id.</u> (emphases added). <u>Champion</u> does not state that the insured may not recover the cost of additional counsel if the defense provided by the insurer is somehow not adequate. That is the very question that must be decided here.

NAICO also cites <u>Ringler Associates, Inc. v. Maryland Casualty Co.</u>, 96 Cal. Rptr. 2d 136 (Cal. Ct. App. 2000), for the proposition that Primrose cannot claim as damages the costs of hiring the Cotton Bledsoe firm because Primrose "was fully protected from having to pay <u>any</u> costs of its own defense by other insurers." <u>Id.</u> at 154. <u>Ringler</u>, however, is distinguishable. As the court there had already decided that the insurer at issue had no duty to defend, the statement that the insured was "fully protected from having to pay <u>any</u> costs of its own defense" was merely dicta. <u>Id.</u> at 153–54. Further, there is no indication at all in <u>Ringler</u> that the insured had incurred any costs associated with its defense. The other insurers had provided and paid for the insured's defense, <u>id.</u> at 143, 147, 154, and there is nothing indicating that the insured hired additional counsel or even alleged that the defense provided by the other insurers was in any way inadequate. <u>Ringler</u>, therefore, does not address the situation squarely before this court, <u>i.e.</u>, whether an insured may be compensated for hiring

24

particular case would constitute a complete defense is a fact-intensive question, not a matter of law. See Satterwhite v. Safeco Land Title, 853 S.W.2d 202, 206 (Tex. App.—Fort Worth 1993, writ denied) ("[R]easonable attorneys' fees is a question of fact for the jury . . . .").

NAICO contends that Primrose is not entitled to recover any damages as a result of NAICO's refusal to provide a defense in the underlying Senns' suit because Primrose actually received from its other insurance carriers the very defense Primrose expected to receive from NAICO. NAICO also suggests that Primrose never criticized or called into question the competency of Ms. Kathleen McCulloch, the Shafer firm's lead counsel, in defending it in the underlying case.

Primrose responds that its concern was not with Ms. McCulloch's quality of representation, but rather with the uninsured exposure with which Primrose was faced. According to testimony elicited at trial, Primrose's president indicated that he chose to retain additional counsel, the Cotton Bledsoe firm, because of several factors, including, inter alia,: (1) the major oil companies that were defendants in the underlying suit had been dismissed, leaving Primrose as the "target defendant"; (2) Primrose was facing demands in excess of its limits with Chubb and Mid-Continent; (3) Primrose was essentially left uninsured for any

_____

counsel in addition to that provided for by other insurers.

25

pollution incident that occurred subsequent to April 1, 1999 (the time period during which NAICO insured Primrose); (4) the Senns were alleging damages that occurred subsequent to April 1, 1999; and (5) Primrose was being defended by Chubb and Mid-Continent under a reservation of rights and Primrose realized that either carrier could withdraw its defense at any time. Primrose's president also testified that if NAICO had agreed to provide a defense, he would have had "the assurance that [NAICO] would stand behind its policy of insurance," indicating that it was NAICO's ultimate refusal to share in the exposure to liability, not the sharing of expenses, that triggered Primrose's decision to retain the Cotton Bledsoe firm.[13]

In sum, the evidence presented by Primrose establishes that while the Shafer firm may have provided an adequate defense, a reasonable jury could nevertheless have found that the Cotton Bledsoe firm was necessary to ensure that Primrose received a "complete defense" against the Senns – a finding that is neither clearly erroneous nor so gross as to be contrary to right reason.

**III. Chris Boyer's Testimony as An Expert**

At trial, Chris Boyer testified as to the reasonableness of the attorney's fees charged Plaintiffs by the two law firms

---

[13] There was also testimony from Chris Boyer, an expert called by Primrose, establishing the reasonableness of the fees charged by the Cotton Bledsoe firm. NAICO takes issue with several aspects of Boyer's testimony at trial, which we address in Part III infra.

retained independently of any insurer—the Cotton Bledsoe firm (for Primrose) and the Ackels firm (for CADA). Boyer was the only witness to testify as to the reasonableness of these fees. NAICO argues that the district court erred in two respects: (1) Boyer should not have been allowed to testify as an expert because he lacked the necessary factual foundation for his opinions; and (2) the district court should have excluded Boyer's testimony because Plaintiffs did not provide a required written report about Boyer, they did not properly respond to NAICO's discovery requests regarding Boyer's testimony, and because Boyer relied on previously undisclosed information and documents in forming his opinion as to the reasonableness of the attorneys' fees.

This court reviews the admissibility of expert testimony for abuse of discretion. Vogler, 352 F.3d at 153. The discretion of the district judge and their ultimate decision will not be disturbed on appeal unless manifestly erroneous. United States v. Tucker, 345 F.3d 320, 326 (5th Cir. 2003). "If it is found that the district court abused its discretion in denying the admission of expert evidence, [this court] must then consider whether the error was harmless, affirming the judgment unless the ruling affected a substantial right of the complaining party." Id.

With respect to the admissibility of expert testimony, the district court is "to ensure that an expert testimony rests upon a reliable foundation." Guillory v. Domtar Indus. Inc., 95 F.3d

1320, 1331–32 (5th Cir. 1996). NAICO argues that Boyer's testimony lacked the proper foundation to qualify as expert testimony. NAICO contends that Boyer could not give his opinion about the reasonableness of the fees charged by the Cotton Bledsoe firm because he did not know to what extent those fees were duplicative of the work performed by the Shafer firm. With regard to CADA and its additional counsel, NAICO contends that the general descriptions of the work performed by the Ackels firm were insufficient for Boyer to express any expert opinion as to the reasonableness of the work completed or the charged fees.

Federal Rule of Evidence 703 provides for the admissibility of an expert's opinion if the sources underlying that opinion are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." FED. R. EVID. 703. Boyer was provided with complete copies of the bills from both the Cotton Bledsoe firm and the Ackels firm, which contained the hourly rates charged and the total number of hours worked by each firm. Because trial courts are considered experts as to the reasonableness of attorney's fees, the district court was properly qualified to conclude that the information upon which Boyer relied was of a "type reasonably relied on" by such expert witnesses. In re TMT Trailer Ferry, Inc., 577 F.2d 1296, 1304 (5th Cir. 1978) ("[A]ppellate courts, as trial courts, are themselves experts as to the reasonableness of attorneys' fees . . . ." (citation omitted)).

Further, the problems NAICO cites with Boyer's testimony go to

28

the weight of the evidence, not to its admissibility. While Boyer admittedly did not review the bills of the Shafer firm in determining the reasonableness of the fees charged by the Cotton Bledsoe firm, the jury was also presented with the testimony of Ms. McCulloch, who described how she and Strange worked on separate facets of the case in an effort to avoid double billing, while also providing Primrose "the best defense that [McCulloch and Strange] possibly could." In addition, although the descriptions in the Ackels firm's bills were general in nature, this contention merely weakens, to some extent, Boyer's testimony. Nevertheless, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the <u>weight</u> to be assigned that opinion rather than its <u>admissibility</u> and should be left for the jury's consideration." <u>United States v. 14.38 Acres of Land, More or Less Situated in Leflore County</u>, 80 F.3d 1074, 1077 (5th Cir. 1996) (emphasis added) (internal quotations and citations omitted). It is the role of the adversarial system, not the court, to highlight weak evidence:

> As the Court in [<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993)] makes clear, . . . the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

<u>14.38 Acres of Land</u>, 80 F.3d at 1078 (quoting <u>Daubert</u>, 113 S.Ct. at 2798). The weaknesses NAICO points out in Boyer's testimony are

29

weaknesses that NAICO could, and did, attack and highlight to the jury at trial.

Moreover, the fair and reasonable compensation for the professional services of a lawyer can certainly be ascertained by the opinion of members of the bar who have become familiar through experience and practice with the character of such services. Boyer, who has been a practicing attorney since 1977, is certified by the Texas Board of Legal Specialization in the oil and gas industry and was a participating attorney in the underlying Senns suit.[14]  It is clear that Boyer was qualified to give his opinion regarding the value of the services rendered, both from his own general knowledge in the practice area, as well as from his personal experience relating to the nature and extent of the services rendered in this particular litigation.

NAICO also claims that Boyer's testimony should have been excluded because Plaintiffs did not comply with the disclosure rules in FED. R. CIV. P. 26(a), which govern the disclosure of information relating to an expert witness.  Under Rule 26, a party must disclose expert witnesses who may testify at trial.  FED. R. CIV. P. 26(a)(2)(A).  The disclosure must "be accompanied by a

---

[14] In the Senns litigation, Boyer represented one of the major oil company defendants that was later dismissed from the case after it was established that the termination of the oil company's interest in the mineral estate preceded the Senns' subsequent purchase of the surface rights to the property at issue.

written report prepared and signed by the witness."[15]    Id. 26(a)(2)(B).  Rule 37 provides that a party who fails to disclose information required by Rule 26(a) is not permitted to use the information as evidence at a trial, "unless such failure is harmless."  Id. 37(c)(1).

The admission or exclusion of expert testimony is a matter left to the discretion of the trial court, and that decision will not be disturbed on appeal unless it is manifestly erroneous. First Nat'l Bank v. Trans Terra Corp. Int'l, 142 F.3d 802, 811 (5th Cir. 1998) (internal quotations and citations omitted).  Further, the admission of expert testimony in violation of Rule 26(a) is subject to harmless error analysis, id. & n.30 (citing FED. R. CIV. P. 37(c)(1)), and a decision not to exclude under Rule 37(c)(1) is also reviewed for abuse of discretion.  Tex. A&M Research Found. v. Magna Transp., Inc., 338 F.3d 394, 401–02 (5th Cir. 2003).

Plaintiffs concede that they failed to provide a written report to NAICO regarding Boyer's expert testimony.  They do point out, however, that they did notify NAICO in a letter dated November 27, 2002, and again in the Pre-Trial Disclosure, that Boyer would be an expert witness on the reasonableness of the attorney's fees in question.  The content of the letter disclosure included the following:

---

[15] As Plaintiffs appear to concede that they did not provide a written report, it is unnecessary to analyze the required contents of the written report

31

> In addition to our other experts, we may call Chris Boyer . . . as an expert on attorney's fees. We anticipate he will testify that the fees and expenses incurred by Primrose and [CADA] were reasonable and necessary. He is being provided copies of the applicable invoices. Enclosed please find a copy of his resume.

Plaintiffs also provided NAICO with a copy of the bills from the Cotton Bledsoe firm and the Ackels firm. Boyer testified at trial that Primrose and CADA incurred damages in the amount of $183,741 and $225,761, respectively, which were the exact amounts reflected in the invoices generated by the Cotton Bledsoe firm and the Ackels firm, respectively.

As Plaintiffs failed to provide required information regarding Boyer's expert testimony, the sole issue before us is whether such failure was harmless to NAICO. In performing a Rule 37(c)(1) harmless error analysis to determine whether the district court properly exercised its discretion in allowing Boyer's testimony, this court looks to four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." Tex. A&M Research, 338 F.3d at 402.

The focus of our inquiry is whether NAICO was prejudiced by Plaintiffs' failure to comply with discovery rules requiring the disclosure of information about Boyer and the testimony he was to provide at trial. Plaintiffs notified NAICO almost six months before trial that they intended to call Boyer as an expert witness.

32

Plaintiffs also revealed to NAICO the nature of the testimony Boyer was going to provide. NAICO also received copies of all the billing invoices upon which Boyer was to rely for his testimony. Moreover, Boyer's ultimate calculations merely involved dividing the total fees charged by the additional firms by the total hours worked. NAICO, which had previously received the bills, certainly could have performed the same calculations. NAICO knew, or should have known, that Boyer was going to testify as to the reasonableness of the attorney's fees incurred by Primrose and that Boyer was basing his opinion primarily on a review of the bills of the Cotton Bledsoe and Ackels firms. NAICO, therefore, was not prejudiced by Boyer's testimony, and thus Plaintiffs' failure to disclose information about Boyer amounts to harmless error.

As such, the district court did not abuse its discretion by allowing Boyer to offer expert testimony as to the reasonableness of the attorney's fees, and thus the corresponding amount of damages awarded by the jury was proper.

## IV. Calculation of Prejudgment Interest

NAICO argues that the district court erred in assessing prejudgment interest. NAICO contends that the district court improperly calculated the interest by basing the date of the alleged breach of contract—when NAICO refused to defend Plaintiffs—as the accrual date even though Plaintiffs, at that time, had not incurred any damages in the form of attorney's fees.

33

NAICO asserts that the prejudgment interest for damages incurred by Plaintiffs should be calculated from the time Plaintiffs actually paid each bill for attorney's fees.

This court generally reviews a decision on a motion to alter or amend judgment for abuse of discretion. <u>Pioneer Natural Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487</u>, 328 F.3d 818, 820 (5th Cir. 2003). To the extent that a ruling was a reconsideration of a question of law, however, the standard of review is <u>de novo</u>. <u>Id.</u> Because the method of calculating prejudgment interest is a question of law, the review is <u>de novo</u>.

Prejudgment interest begins to accrue on the earlier of 180 days after the date the defendant receives written notice of a claim or the day suit is filed. <u>Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.</u>, 962 S.W.2d 507, 531 (Tex. 1998). However, how this rule applies to cases where damages accrue at times subsequent to either date is an issue that the Texas Supreme Court has not yet addressed.[16] This court must predict how the Texas Supreme Court would decide this issue. In making an "<u>Erie</u> guess"

---

[16] Plaintiffs assert that neither Texas's interest statutes nor its case law require anything but a lump sum calculation, but concede that the Texas Supreme Court has not addressed this question directly. NAICO contends that the district court's application of prejudgment interest misapplied <u>Johnson & Higgins</u>, but does not direct this court to where the Texas Supreme Court addressed this particular issue. While this court has previously decided this issue favoring NAICO's position, we applied Mississippi law. <u>Liberty Mut. Fire Ins. Co. v. Canal Ins. Co.</u>, 177 F.3d 326, 339 (5th Cir. 1999).

in a diversity case, this court will "seek guidance by looking to the precedents established by intermediate state appellate courts only when the state supreme court has not spoken on an issue." Webb v. City of Dallas, 314 F.3d 787, 795 (5th Cir. 2002) (internal quotations and citations omitted). However, if "convinced by other persuasive data that the highest court of the state would decide otherwise," this court will not defer to the decisions of the intermediate state appellate courts. Herrmann Holdings Ltd. v. Lucent Techs. Inc., 302 F.3d 552, 558 (5th Cir. 2002) (internal quotations and citations omitted).

In two unpublished cases, the Dallas appellate court in 2001 twice held that while prejudgment interest was to be calculated on the total amount of damages at the time of judgment, the accrual date should be based on one point in time, regardless of whether the total amount of damages had occurred at that time. Am. Technical Res., Inc. v. Network Staffing Servs., Inc., No. 05-00-01124-CV, 2001 WL 969210, at *6 (Tex. App.—Dallas Aug. 28, 2001, no pet.) (not designated for publication) (holding that prejudgment interest should not be calculated based on a month-by-month basis); Basic Capital Mgmt., Inc. v. Phan, No. 05-00-00147-CV, 2001 WL 893986, at *8 (Tex. App.—Dallas Aug. 9, 2001, no pet.) (not designated for publication) (holding that prejudgment interest should not be calculated based on a paycheck-by-paycheck basis). These cases, however, do not factor into this court's Erie guess.

35

As a preliminary matter, unpublished cases are not precedent in Texas, TEX. R. APP. P. 47.7, and secondly, neither case provides a persuasive argument suggesting how the Texas Supreme Court would decide the issue.

Language in Johnson & Higgins, however, does offer insight into how the Texas Supreme Court would likely decide the issue. In that case, the Texas Supreme Court explained the rationale and the desired incentives behind the charging of prejudgment interest. The court determined that "[p]rejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." Johnson & Higgins, 962 S.W.2d at 528 (internal quotations and citations omitted). Further, "prejudgment interest [is] necessary to fully compensate injured plaintiffs." Id. at 529 (emphasis added). In fashioning prejudgment interest rules, the Texas Supreme Court has been "primarily concerned with advancing two ends: (1) encouraging settlements and (2) expediting both settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs." Id. Texas's prejudgment rules should "serve the goal of compensating plaintiffs, without overcompensating them or simultaneously punishing defendants" and should "accurately reflect the damages incurred by the plaintiff for the lost use of money." Id. at 532–33.

The goals of prejudgment interest laws, as expressed in

36

<u>Johnson & Higgins</u>, are better served by a rule that such interest be calculated from the time a plaintiff actually loses the use of the money rather than when the actual breach occurred. In this case, therefore, the prejudgment interest should be assessed against NAICO based on the dates Plaintiffs paid each bill for attorney's fees rather than the date NAICO refused to defend Plaintiffs. How such a rule is consistent with and serves the goals expressed in <u>Johnson & Higgins</u> is explained by the Supreme Judicial Court of Massachusetts in a case involving the same issue in the same context:

> While the defendant was in breach of its duty to defend Sterilite on January 5, 1976, there was no duty at that time to reimburse Sterilite for legal expenses incurred at later dates. This duty arose when Sterilite, on notice that the defendant would refuse to pay for those expenses, was forced to pay those expenses itself. The dates of the payment of the various bills, which are readily ascertainable, determine the points at which Sterilite was obliged to commit sums which it rightfully should not have been obliged to commit. Before those bills were paid, Sterilite was not deprived of the use of its money. No interest is due on sums when Sterilite was not deprived of the use of those sums. Any other rule would result in a windfall for Sterilite, which the Legislature did not intend. Therefore, prejudgment interest . . . should be calculated in this case on the basis of the various dates on which the legal bills were paid by Sterilite.

<u>Sterilite Corp. v. Continental Cas. Co.</u>, 494 N.E.2d 1008, 1011 (Mass. 1986).

In this case, Plaintiffs did not lose the use of their money until they paid their attorney's fees. Granting Plaintiffs prejudgment interest accruing at a date any earlier than when they

37

actually paid such fees would overcompensate them, punish NAICO, and not accurately reflect Plaintiffs' damages. This court, therefore, concludes that Texas's prejudgment interest goals would be better served by adopting the rule proposed by NAICO and followed by Massachusetts in <u>Sterilite</u>. As such, the district court abused its discretion in denying NAICO's motion, and we remand the cause so that the district court may properly calculate and assess prejudgment interest in accordance with the rule announced herein.

## CONCLUSION

Having carefully reviewed the record of this case, the parties' respective briefing and arguments, and for the reasons set forth above, we AFFIRM the post-trial rulings of the district court. However, we further conclude that the district court erred in denying NAICO's motion to amend or alter the judgment on the issue of calculating prejudgment interest. We therefore, REVERSE that portion of the district court's order and accordingly REMAND this case for further proceedings not inconsistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

38